The **BIBLE WAY CHURCH OF OUR LORD JESUS CHRIST OF THE APOSTOLIC FAITH OF WASHINGTON, D.C., et al., Appellants,**

v.

**Eddyemae R. BEARDS, et al., Appellees.**

**Eddyemae R. BEARDS, et al., Appellants.**

v.

**James SILVER, et al., Appellees.**

**Nos. 95–CV–311, 95–CV–527.**

District of Columbia Court of Appeals.

Argued May 23, 1996.

Decided July 24, 1996.

B. Michael Rauh, with whom Martin Shulman was on the brief, Washington, D.C., for

appellants in No. 95–CV–311 and appellees in No. 95–CV–527.

Clement T. Cooper, Washington, D.C., for appellees in No. 95–CV–311 and appellants in No. 95–CV–527.

Before FERREN and KING, Associate Judges, and KERN, Senior Judge.

FERREN, Associate Judge.

These consolidated appeals reflect two suits by Eddyemae R. Beards and Julius Beards against The Bible Way Church of Our Lord Jesus Christ of Washington, D.C., its pastor James Silver, and its board of trustees.[1] In the first appeal (No. 95–CV–311), Bible Way contends the trial court erred in refusing to dismiss the complaint's first count charging Bible Way with negligent failure to account for church funds and to issue financial reports to church members.[2] In the second appeal (No. 95–CV–527), the Beardses maintain the trial court erred in dismissing their complaint for (1) breach of contract, (2) harassment, (3) defamation, (4) intentional infliction of emotional distress, (5) tortious interference with an employment contract, and (6) invasion of privacy. In No. 95–CV–311 we reverse, and order dismissal of the negligence claim, and we affirm dismissal of the other two counts. In No. 95–CV–527 we affirm.

## I.

Bible Way Church is a tax-exempt religious organization incorporated in the District of Columbia under D.C.Code § 29–901. et seq. (1991 Repl.). The church has a congregation of approximately 3,000 members and has been incorporated in the District since Bishop Smallwood E. Williams

---

1. The Beardses named as defendants in both their lawsuits The Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C.; James Silver, pastor of Bible Way Church and a member of its board of trustees; and Yvonne L. Williams, Wendell M. Slade, Jerome Stevens, and Jeanne Marshall, the remaining members of the church's board of trustees. For ease of reference, we refer to the defendants collectively as "Bible Way" and the institutional defendant, The Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C., simply as "Bible Way Church."

2. The trial court dismissed the second and third counts of the Beards' complaint as well as the Beards' later-filed motion for class certification. The Beardses have not filed a cross-appeal objecting to these rulings. Because of our overall disposition, the denial of class certification is moot. For the reasons stated below in Part II. C., however, we consider the trial court's dismissal of counts two and three.

founded it in 1936. As a qualifying religious organization, the Bible Way Church is not required to file federal or District income-tax returns or annual reports required of corporations in the District.

Eddyemae R. Beards became a member of Bible Way Church on May 13, 1951, and began working as a church volunteer in 1963. In 1979, Bishop Williams, then pastor of the church, hired her to work as a part-time employee. By 1991, Eddyemae Beards worked approximately forty to fifty hours per week for the church. After the death of Bishop Williams on June 28, 1991, James Silver, the church's interim pastor, hired Beards as Financial Secretary of the church to assume responsibility for maintaining records of individual member contributions.

At the time of Beards' appointment as Financial Secretary, the church received its income through tithes imposed on its members and from various church fundraisers. According to the Beards' first-filed complaint, Eddyemae Beards' relationship with Silver began to deteriorate in January 1992 when she issued a salary check for $15,600 to Wallace Williams, a church elder who had been suspended from the church, and paid related federal and District withholding taxes. According to the Beardses, Silver used the church intercom to tell Eddyemae Beards that she could be charged with embezzlement for issuing the check, and he later subjected her to unspecified daily humiliations, verbal abuses, and defamatory accusations as a result of the incident.

Approximately two years later on December 1, 1993, Silver sent a letter to Beards informing her that "as part of our ongoing administrative reorganization, the Bible Way Church is discontinuing the position of Financial Secretary, effective today." On May 27, 1994, Eddyemae Beards and Julius Beards, her husband, filed suit (No. 95–CV–527) naming Bible Way Church, Pastor James Silver, and each member of the board of trustees as defendants (collectively "Bible Way," *supra* note 1). The complaint stated six contract and tort counts (summarized earlier) arising out of Eddyemae Beards' dismissal. The defendants moved on July 25, 1994, to dismiss the complaint for failure to state a claim upon which relief could be granted.

In the meantime, on June 10, 1994, the Beardses filed a second, three-count suit (No. 95–CV–311) against Bible Way. Count one charged negligence, alleging that Bible Way had violated a duty of care owed to its members—reflected in particular "Standards of Responsible Stewardship" and "Guidelines and Standards for Audits and Certified Public Accounts"—as a result of the following defaults (among others): failing to monitor "funds received from all sources" for over twenty years; permitting itself to "fall under the complete domination" of the pastor; failing to comply with Social Security and other federal, as well as local, tax laws; failing to separate the church's religious operations from its "purely secular" activities such as a day care center, apartment complex, and supermarket; failing to account for funds turned over to the wife of the founding pastor; failing for over fifteen years to account for the receipts averaging over $150,000 from the annual church banquet; failing to provide annual financial reports to the members based on monthly statements prepared by Eddyemae Beards as Financial Secretary; failing to account for church funds collected from "Annual Rallies" of "all Church Clubs;" failing to account for the "tithes" paid by "more than 3,000 dues paying members" of the church; failing (before Eddyemae Beards became Financial Secretary) "to maintain accurate records of funds received by the Church;" and violating "the normal, acceptable standards of: (a) Responsible Stewardship and (b) Guidelines and Standards for Audits and Certified Public Accountants."

Count two of the complaint alleged that Bishop Williams had created a testamentary trust in his will for the benefit of church members. The Beardses requested an accounting of, and a receiver for, the testamentary assets. Count three reiterated all previous allegations and sought an accounting of all Bible Way Church assets.

On August 4, 1994, Bible Way moved to dismiss count one (negligence) of the second-filed (June 10) complaint on the ground it was absolutely immune from suit and thus that the court lacked subject matter jurisdic-

tion. The defense premised immunity on a proffer that the claim would entangle the trial court in matters of "internal church governance." Bible Way moved to dismiss count two for failure to state a claim upon which relief could be granted and sought dismissal of count three as duplicative of the other counts.[3] On October 6, 1994, while the defense motion was pending, the Beardses sought class certification of the counts stated in the second-filed complaint, naming as a class all past and present members of the Bible Way Church.

On March 3, 1995, the trial court ruled on the motions pending on the second-filed complaint. The court denied class certification because the Beardses had failed to file the motion within ninety days of filing the complaint, as required by Super. Ct.Civ.R. 33–I(b)(1). The trial court then granted Bible Way's motion to dismiss counts two and three but denied the motion to dismiss the negligence count. The court concluded that this first count could be resolved exclusively by reference to objective, well-established standards of accounting and reporting that would not entangle the court in matters of religion in contravention of the First Amendment. Bible Way filed an interlocutory appeal of this ruling; the Beardses did not cross-appeal the court's other rulings.

On April 4, 1995, the trial court granted Bible Way's motion to dismiss each count of the Beards' first-filed (May 27, 1994) complaint. The court initially ruled that Eddyemae Beards had been an at-will church employee whose dismissal could not be challenged under the exception to the at-will employment doctrine announced in *Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C.1991) (allowing wrongful discharge claim where at-will employee fired for refusing to violate law). The court then dismissed the first and fifth counts alleging, respectively, breach of contract and tortious

interference with an employment contract. The court also dismissed count two, ruling that it duplicated the other counts and was based on a non-existent tort ("harassment") in the District of Columbia. Finally, the court ruled that the defamation, intentional infliction of emotional distress, and invasion of privacy counts were barred by the applicable statute of limitations. The Beardses filed a timely notice of appeal.

## II.

### *Appeal No. 95–CV–311*

#### A.

 Bible Way contends, on interlocutory appeal, the trial court erred in denying its Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Although this court ordinarily reviews only "final orders and judgments" of the Superior Court, *see* D.C. Code § 11–721(a)(1) (1995 Repl.), we will treat certain interlocutory orders as final and "collateral," and hence appealable, when "they have a final and irreparable effect on important rights of the parties." *United Methodist Church v. White*, 571 A.2d 790, 791–92 (D.C.1990); *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949) (denial of motion to require plaintiff to post security in stockholder derivative action appealable as final disposition but not ingredient of cause of action); *Jenkins v. Smith*, 535 A.2d 1367, 1367 (D.C.1987) (en banc) (interlocutory appeal from denial of motion to dismiss on ground of *forum non conveniens* permitted); *Stein v. United States*, 532 A.2d 641, 643 (D.C.1987) (recognizing collateral order doctrine), *cert. denied*, 485 U.S. 1010, 108 S.Ct. 1477, 99 L.Ed.2d 705 (1988). To qualify for appellate review, such orders "must conclusively determine the undisputed question"; must "resolve an important issue completely separate from the merits of the action"; and be "effectively unreviewable on appeal from a

---

**3.** Bible Way moved to dismiss both counts one and two on the alternative ground that the Beardses had failed to join an indispensable party as required by Super.Ct.Civ.R. 19(a). Bible Way contended that the estate of Bishop Williams was indispensable to the first count and that his widow, Verna L. Williams, was indispensable to the second count. The court ruled

that because Bishop Williams was "at best a joint tortfeasor" as to count one, his estate was not an indispensable party for that claim. As for the second count, the trial court deemed Bible Way's Rule 19(a) motion moot after dismissing the count for failing to state a claim upon which relief could be granted.

final judgment." *Stein*, 532 A.2d at 643 (quoting *Flanagan v. United States*, 465 U.S. 259, 265, 104 S.Ct. 1051, 1055, 79 L.Ed.2d 288 (1984)).

■ The trial court's denial of Bible Way's Rule 12(b)(1) motion plainly satisfies the three prerequisites for the "narrow exception to the rule of finality" for appellate review. *White*, 571 A.2d at 792 (appellate jurisdiction to hear interlocutory appeal where trial court denied church's motion to dismiss on grounds of First Amendment immunity). The order (1) has conclusively determined (by rejecting) Bible Way's claim of immunity from suit under the First Amendment's Free Exercise Clause; (2) has resolved a claim of immunity unrelated to the merits of the Beards' negligence claim; and (3) will effectively cause Bible Way to lose its immunity if the case proceeds to trial. The trial court's order, therefore, is immediately appealable and we proceed to review it.

### B.

In support of its Rule 12(b)(1) motion, Bible Way argues for its immunity from suit, and for the trial court's corresponding lack of subject matter jurisdiction, because resolution of the negligence claim alleging failure to account for, and report, church finances would involve the court in an ecclesiastical dispute—an involvement forbidden by the Free Exercise Clause. *See Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709–10, 96 S.Ct. 2372, 2380–81, 49 L.Ed.2d 151 (1976) (judicial review of church property dispute constitutionally forbidden where substantial danger court would become entangled in essentially religious controversy); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116, 73 S.Ct. 143, 154–55, 97 L.Ed. 120 (1952) (state legislation affecting which prelate entitled to use church property barred by First Amendment); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1871) (concluding that "the rule of action" governing civil courts should be for legal tribunals to accept decisions of church bodies where "questions of discipline, or of faith, or ecclesiastical rule, custom, or law" are involved).

■ The trial court ruled, to the contrary, that the claim "does not require the court to delve into religious rules or the church's internal government and policy." The court therefore denied Bible Way's Rule 12(b)(1) motion, concluding that Bible Way's negligence, if any, could be determined by reference "exclusively [to] objective, well-established concepts of [accounting and record-keeping]."[4] In so ruling, the court likened the issue to a secular dispute over church property that courts have been able to resolve without a First Amendment bar. *See Jones v. Wolf*, 443 U.S. 595, 604, 99 S.Ct. 3020, 3026, 61 L.Ed.2d 775 (1979) ("a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a

---

4. The allegedly objective concepts were identified in the Beards' complaint as the "Standards of Responsible Stewardship" and the "Guidelines and Standards for Audits and Certified Public Accountants." The Beardses later supplied the court, in a "Statement of Material Facts Not in Dispute," with excerpts from various accounting handbooks such as: "Audits of Certain Nonprofit Organizations," published by the American Institute of Certified Public Accountants (AICPA); "Accounting Principles and Reporting Practices for Certain Nonprofit Organizations," published by AICPA; "Standards of Responsible Stewardship," published by the Evangelical Council for Financial Accountability; and "Standards for Charitable Solicitations," published by the Council of Better Business Bureaus, Inc.

It is unclear from the record which particular accounting standards, those named in the complaint or those later identified in the "Statement of Material Facts Not in Dispute," the trial court was referring to in its ruling. Where a Rule 12(b)(1) motion alleges that the lack of jurisdiction is apparent on the face of the complaint, it is regarded as a "facial" attack and the court must treat the allegations in the complaint as true. Where the motion concerns matters outside the complaint, it is a "factual" attack and the court is free to weigh the evidence without any presumptions regarding its truthfulness. *See Matthews v. Automated Bus. Sys. & Servs.*, 558 A.2d 1175, 1179 n. 7 (D.C.1989); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). In contrast with deciding a Rule 12(b)(6) motion, the trial court, in deciding a Rule 12(b)(1) motion, may review any evidence submitted by the parties, including affidavits, without converting the motion into a Rule 56 motion for summary judgment. *Matthews*, 558 A.2d at 1179. Thus, the grant of Rule 12(b)(1) motion based on a "factual" attack is a ruling without prejudice, not a final judgment on the merits. *See Matthews*, at 1179 n. 6.

church property dispute"); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969) ("there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property can be awarded"); *Burgess v. Rock Creek Baptist Church,* 734 F.Supp. 30, 32 (D.D.C.1990) (discussing neutral principles doctrine as applied to church property disputes; refusing to apply doctrine to church membership dispute).

▆▆▆ The issue of subject matter jurisdiction is a question of law, and thus we review the denial of the Rule 12(b)(1) motion *de novo.* *See White,* 571 A.2d at 793 (implicitly adopting *de novo* standard of review to consider denial of church's Rule 12(b)(1) motion asserting First Amendment immunity); *see also Herbert v. National Academy of Sciences,* 297 U.S.App.D.C. 406, 411, 974 F.2d 192, 197 (1992); *Windfield v. Groen Div., Dover Corp.,* 890 F.2d 764, 766 (5th Cir.1989).[5]

▆▆▆ Because Bible Way Church is a religious institution, we agree with the church that, in filing the complaint against the church and its leaders, the plaintiffs immediately confronted a potential First Amendment bar to the trial court's subject matter jurisdiction. Well-settled case law demonstrates that the Free Exercise Clause precludes civil courts "from adjudicating church fights that require extensive inquiry into matters of 'ecclesiastical cognizance.'" *Burgess,* 734 F.Supp. at 31 (quoting *Serbian Eastern,* 426 U.S. at 708, 96 S.Ct. at 2380). Rather, "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern,* 426 U.S. at 713, 96 S.Ct. at 2382; *see also Kedroff,* 344 U.S. at 116 n. 23, 73 S.Ct. at 154 n. 23 ("the decisions of the

proper church tribunals on matters purely ecclesiastical . . . are accepted before the secular courts as conclusive," (quoting *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16–17, 50 S.Ct. 5, 7–8, 74 L.Ed. 131 (1929))); 66 AM.JUR.2D *Religious Societies* § 32, at 784 (2d ed. 1973); 77 C.J.S. *Religious Societies* § 84, at 107 (1994). This is not to say that civil court review of church action is absolutely prohibited; "the church is not above the law." *White,* 571 A.2d at 795. As the trial court therefore recognized, occasions can arise when civil courts are permitted to address church activity without running afoul of the First Amendment. *See, e.g., Jones,* 443 U.S. at 604, 99 S.Ct. at 3026; *Burgess,* 734 F.Supp. at 32; *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 50 S.Ct. 5, 7–8, 74 L.Ed. 131 (1929) (raising possibility of fraud or collusion exception to church immunity); *Minker v. Baltimore Annual Conference of United Methodist Church,* 282 U.S.App.D.C. 314, 318, 894 F.2d 1354, 1360 (1990) (permitting breach of contract claim against church defendant). Civil courts, however, must be careful not to violate the First Amendment by agreeing to resolve a controversy which, at its heart, concerns "religious doctrine and practice." *Burgess,* 734 F.Supp. at 31.

▆▆▆ The critical issue in deciding Bible Way's Rule 12(b)(1) motion, therefore, is whether we can conclude from reading the complaint that the Beards' negligence claim falls within the trial court's constitutionally circumscribed, secular jurisdiction over cases involving religious institutions. Central to this inquiry is the Beards' allegation—on which the trial court relied for subject matter jurisdiction—that the negligent accounting and reporting claim can be decided, consistent with the Constitution, by applying the "objective, well-established concepts of [accounting and record-keeping]" that are reflected in the "Standards of Responsible Stewardship" and the "Guidelines and Standards for Audits and Certified Public Ac-

---

5. Because Super.Ct.Civ.R. 12 is identical to its federal counterpart, FED.R.CIV.P. 12, we may look to court decisions interpreting the federal rule as "persuasive authority in interpreting [the local rule]." *Vale Properties, Ltd. v. Canterbury Tales, Inc.,* 431 A.2d 11, 13 n. 3 (D.C.1981). *See also*

*Wallace v. Warehouse Employees Union No. 730,* 482 A.2d 801, 807 (D.C.1984) (noting this court construes Superior Court rules in light of corresponding federal rules as long as not contrary to binding precedent).

countants" cited in the Beards' complaint. See *supra* note 4. Under this rationale, the court presumably would avoid First Amendment problems because it could judge the church's actions with reference to uniformly applicable, secular criteria that would not involve the court in resolving a dispute with doctrinal implications. *See Jones,* 443 U.S. at 608, 99 S.Ct. at 3027–28 (applying principles of property law); *Presbyterian Church,* 393 U.S. at 450, 89 S.Ct. at 606–07 (same); *Minker,* 894 F.2d at 1360 (applying principles of contract law); 77 C.J.S. *Religious Societies* § 85, at 108–109 ("[civil courts] do have jurisdiction as to civil contract and property rights even though such rights are involved in, or arise from, a church controversy").

Theoretically, there are two possible circumstances that would permit a court to apply clear, objective accounting and reporting criteria to church financial practices without implicating church doctrine: (1) if the principles are so universally—and indisputably—applicable to every organized church that they can, indeed must, be taken for granted without need for church action to adopt them; or (2) even if these principles are not automatically applicable to every church, they are applicable in a particular case because the church has in fact adopted them. In either circumstance, the court would not have a role in deciding what principles apply to the church; the court merely would be asked to apply, without ecclesiastical judgment or intrusion, a previously prescribed, authoritative, nondiscretionary—and clear—policy.

In their complaint, the Beardses define the standard of care by referring to "existing standards applicable to Financial Stewardship," to "mandatory financial disclosure practices," to "Standards or Rules of Stewardship which have been in existence since 1979," to "Standards of Responsible Steward-

ship" and, in one instance, to complementary "Guidelines and Standards for Audits and Certified Public Accountants." Although the trial court apparently saw these variously described standards as reflecting "objective, well-established concepts," the complaint does not say whether these standards universally and indisputably apply to *every* church organization, *i.e.,* whether the leadership of *every* church unquestionably must, as demanded here, account to its members for all financial income and outgo, unaffected by any doctrinal limitation that might restrict the kind of accountability required. Accordingly, the complaint premises Bible Way's alleged negligence on the applicability of cited "standards" without alleging exactly what the standards are, where they can be found, and, of critical significance, why the proffered standards are the *only* objective criteria that can apply to a church. Absent such concrete allegations coupled with a proffered basis for believing a proposition that seems counterintuitive for a church institution, we cannot accept the trial court's ruling that says, in effect, the plaintiff's proffered standards inevitably apply. We perceive no sound basis for that conclusion.

Because the complaint does not adequately allege indisputable, universally applicable rules of accounting and financial reporting, the trial court could not have had subject matter jurisdiction unless the church itself had formally adopted the particular standards the Beardses seek to enforce through civil court action.[6] If the church has, in fact, adopted clear, objective accounting and reporting standards that eliminate all doctrinal decision-making in their enforcement, then arguably a civil court can apply them—much as a court can resolve secular disputes over church property—because the church itself presumably has obviated all First Amendment concerns. *See Watson,* 80 U.S. (13 Wall.) at 727, 77 C.J.S. *Religious*

---

6. Under D.C.Code § 29–904 (1988 Repl.), a religious institution has wide latitude to adopt its own regulations and rules including, presumably, its own accounting and financial reporting practices:

The trustees or directors shall hold office during the period stated in their certificates, and vacancies in the office of trustee may be filled by election or appointment as above provided,

and rules and regulations may be adopted in relation to the management of the estate and the duties of trustees or directors, or for their removal from office, in accordance with the rules or discipline governing the church or denomination to which such society or congregation may belong, not inconsistent with the Constitution of the United States and the laws in force in the District.

*Societies* § 85, at 109 ("courts will only inquire as to what are the rules and decisions of the church and its tribunals without questioning their wisdom or propriety"). If, however, the church has not adopted specific accounting and reporting standards, the court—by having to decide whether particular principles *should* be applied—will inevitably have to exercise discretion over a matter that initially requires ecclesiastical judgment. As Bible Way convincingly points out in its brief, a church's financial regime, including any required reports to members, necessarily reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds, that a civil court cannot arbitrate without entangling itself in doctrinal interpretations:

> Accounting is an area riddled with major subjective decisions. When the entity in question is a religious society, those subjective decisions raise questions of internal church governance which are often themselves based on the application of church doctrine. For example:
>
>> What should be the collection, tithing, or offering practices of the church?
>>
>> Should the church pursue pledges from—or take any other particular type of action affecting—members who neglect to remit their obligations?
>>
>> What cash management and investment decisions should be made?
>>
>> Who in the church establishes its spending priorities?
>>
>> Should the pastor have one or more discretionary funds?
>>
>> Should there be an audit committee, and if so, should its membership be internal, external, or both, and how many members of each type should there be?
>>
>> Should the church maintain any of its funds as imprest accounts useable only for specified purposes, or should church finances be operated as a general account?
>>
>> In each case, who makes the decision?

Crucial to the trial court's entertainment of the complaint, therefore—in the absence of an explicit allegation that specified accounting standards are universally and indisputably applied to churches—is an allegation that the church, in fact, has adopted the standards a plaintiff seeks to enforce. A mere reference to the existence of published accounting standards, without alleging that they inherently, and thus inevitably, apply—or without saying, alternatively, that the church formally has adopted them—would leave the complaint too fuzzy for the court to be sure it constitutionally can rule. In short, because a complaint challenging church action is not easily cognizable in a civil court, there is a heightened pleading requirement to assure that the defendants will not be unduly burdened. *See Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584, 589 (1991) (dismissing negligent hiring claim against church after applying heightened pleading standard; requiring that operative facts be pled with particularity because of "the myriad [of] First Amendment problems" accompanying such claims); *see also Letica Corp. v. Sweetheart Cup Co.*, 790 F.Supp. 702, 706 (E.D.Mich.1992) (noting courts have required greater specificity in pleading where case implicates conduct *prima facie* protected by First Amendment).

In this case, the complaint does not expressly allege, or even clearly imply, that the church has adopted the accounting standards referenced in the complaint. The complaint says:

> There existed a set of Standards or Rules of Stewardship which have been in existence since 1979. That the Standards of Responsible Stewardship were in existence, and continue in existence, during all times mentioned. That the Standards are the measurement by which conduct of the Defendants must be judged in the pending action.

The complaint then alleges the particular violations summarized earlier that presumably violate the cited standards. For all the reader can tell, the "Standards of Responsible Stewardship" and related "Guidelines and Standards for Audits and Certified Public Accountants" exist altogether outside the Bible Way Church, and the plaintiffs accordingly are asking the court to select and impose them on a church board of trustees that

apparently has declined to do so. We therefore cannot be satisfied that the trial court had jurisdiction to hear the claim. Given the heightened pleading required in this context, we must conclude that the complaint fails to survive the "facial" attack from Bible Way's motion to dismiss under Rule 12(b)(1). *See supra* note 4 (discussing *Matthews*, 558 A.2d at 1179 n. 7).

We recognize that liberal rules of pleading normally protect a plaintiff against dismissal of an ambiguous complaint when it can be said to state a claim if all reasonable inferences are drawn in the plaintiff's favor. *See* Super.Ct.Civ.R. 8(a) (1996); *Scott v. District of Columbia*, 493 A.2d 319, 323 (D.C.1985) (under Rule 8(a) complaint is sufficient as long as it fairly puts defendant on notice of claim); Charles A. Wright & Arthur R. Miller, 5 FEDERAL PRACTICE AND PROCEDURE § 1215, at 136–38 (2d ed 1990) ("objective of [Rule 8(a)] to avoid technicalities and to require that the pleading discharge the function of giving the opposing party fair notice"). Ordinarily, therefore, one might liberally construe the Beards' complaint to allege a valid basis for applying the standards it cites without involving the court in the exercise of doctrinal discretion. In this kind of case, however, we cannot do so. The possibility of universal, indisputable accounting and reporting criteria for all churches is almost self-evidently contrary to reason, and, alternatively, there is nothing at all in the Beards' complaint to suggest that Bible Way Church adopted the standards that the Beardses say must apply. As *Byrd* and *Letica Corp.* make clear, when the First Amendment casts a shadow over the court's subject matter jurisdiction, the plaintiff is obliged to plead unqualified jurisdictional facts that clearly take the case outside the constitutional bar. There is no justifiable reason to make a church answer a complaint, let alone go through discovery, unless a plaintiff specifically and unequivocally pleads all facts necessary to establish the court's jurisdiction.

This requirement of particularity is not a foreign idea; it commonly is imposed in other contexts such as alleged fraud, or ineffective assistance of counsel, where fairness to the defendant requires unequivocal, specific allegations signed by the plaintiff, as well as by the attorney, that verify the truth of the charges in detail. *See* Super.Ct.Civ.R. 11; *Ellerbe v. United States*, 545 A.2d 1197, 1198 (D.C.) (requiring particularized statement of facts for ineffective assistance of counsel claims), *cert. denied*, 488 U.S. 868, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988); Super.Ct.Civ.R. 9(b) (1996) (requiring "in all averments of fraud of mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). No less should be required when the Constitution severely circumscribes the court's subject matter jurisdiction over church controversies.

The importance of the heightened pleading requirement is underscored by the fact that, in its defense, Bible Way filed a church officer's uncontested affidavit stating under oath that the church had not adopted the accounting principles on which plaintiffs would have the court rely—a document the court may consider in deciding not merely a "facial" but a "factual" attack under Rule 12(b)(1). *See Matthews*, 558 A.2d at 1179; *supra* note 4. Indeed, counsel for the Beardses themselves acknowledged at oral argument on appeal that Bible Way had not formally adopted any of the accounting and reporting standards on which plaintiffs rely.

In sum, we conclude it is fatal to the complaint that the Beardses did not specifically plead that the allegedly objective, published accounting and reporting standards referenced in the complaint either are universally and indisputably applicable to all churches, or had been formally adopted by Bible Way Church. The negligence count in No. 95–CV–311, therefore, must be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because of its failure to survive both a "facial" attack and a "factual" attack on the complaint. *Matthews*, 558 A.2d at 1179 n. 7.

We are not oblivious or indifferent to the Beards' concern that a church's very failure to adopt accounting and reporting standards effectively protects church leaders against civil court scrutiny that might well occur if the church, acting more responsibly, had adopted objective criteria that a court

could apply without intruding on church doctrine. In expressing such concern, however, the Beardses overlook the primacy of church tribunals for deciding such matters, consistent with the First Amendment. *See Serbian Eastern,* 426 U.S. at 713, 96 S.Ct. at 2382; *Kedroff,* 344 U.S. at 116, 73 S.Ct. at 154–55; *Watson,* 80 U.S. (13 Wall.) at 728–29, 66 AM.JUR.2D *Religious Societies* § 32, at 783. Absent an effective church tribunal or adoption of standards a civil court can apply without crossing an ecclesiastical line, a church member's only remedy for perceived financial irregularity appears to be cutting one's losses by leaving the membership.

### C.

■ The Beardses also contend the trial court erred in dismissing count two of their second-filed complaint (alleging creation of a testamentary trust under Bishop Williams' will), in dismissing count three (calling for an accounting), and in dismissing their motion for class certification. The Beardses failed, however, to file a cross-appeal. *See* D.C.App.R. 4(a)(1) (requiring notice of appeal within thirty days after entry of judgment or order). Normally, when a party fails to file a timely cross-appeal, we apply a well-settled rule of practice: "on an adversary's appeal a party may not challenge or seek to enlarge a judgment to which [the party] did not object." *Stutsman v. Kaiser Found. Health Plan,* 546 A.2d 367, 370 (D.C.1988); *accord Associated Third Class Mail Users v. United States Postal Serv.,* 213 U.S.App.D.C. 252, 255, 662 F.2d 767, 770 (1980).

■ Because this rule of practice is not a rule of jurisdiction, however, it "may be dispensed with under appropriate circumstances." *Edwards v. Woods,* 385 A.2d 780, 783 (D.C.1978) (citing *Langnes v. Green,* 282 U.S. 531, 538, 51 S.Ct. 243, 246, 75 L.Ed. 520 (1931)); *Saul v. Rowan Heating & Air Conditioning, Inc.,* 623 A.2d 619, 620 n. 1 (D.C. 1993); *see also* 9 MOORE'S FEDERAL PRACTICE ¶ 204.11[5], at 66–67 (1996). Both Bible Way and the Beardses have expressly requested the court to review the testamentary trust and class certification issues and have briefed and argued them before this court. Because we discern no unfair prejudice that would

result to either party from appellate review, and because the contentions may be easily disposed of, we are willing to deviate from the normal practice and consider these contentions.

■ We turn to the first issue. In order to discern creation of a testamentary trust, we look to the language of the will. *See Knupp v. District of Columbia,* 578 A.2d 702, 704 (D.C.1990) (general rule of construction looks to language of will to determine testator's intent); *Stern v. J. Nichols Produce Co.,* 486 A.2d 84, 88 (D.C.1984) (examining plain language of document to discern whether trust created); WILLIAM J. BOWE & DOUGLAS H. PARKER, 5 PAGE ON THE LAW OF WILLS § 40.9. at 127–29 (1962). "If the intention to create a trust does not appear from the language used, and if the will may be given effect without the existence of a trust, an intention to create a trust will not be inferred." *Id.* § 40.9, at 128.

■ According to the Beardses, the Fifth Article of the Bishop's will pertaining to distribution of the residuary estate establishes a testamentary trust. According to that Article:

> All the rest, residue, and remainder of my property, of whatsoever kind and wheresoever situated ... I give, devise, and bequeath to my beloved spouse, Verna L. Williams, hereinafter referred to as my "Spouse," if my spouse survives me. If my Spouse does not survive me, I give, devise, and bequeath the said residue of my Estate to my daughter, Yvonne L. Williams. If my said daughter predeceases me, I give, devise, and bequeath the said residue of my Estate to the Bible Way Church of our Lord Jesus Christ, with headquarters in Washington, D.C.

This provision falls well short of reflecting any kind of intent to create a testamentary trust. Bishop Williams' intent, clearly evidenced by the language of the will, was to bequeath his residuary estate to his wife, Verna L. Williams, absolutely, if she survived him, otherwise absolutely to Yvonne L. Williams, Bishop Williams' daughter, if his wife predeceased him. Bible Way Church was to receive the residuary estate only in

the event that both women predeceased Bishop Williams, which did not occur.

The Beardses reply that creation of a testamentary trust can be inferred from the will because the will purportedly granted powers to the estate representative normally vested in a trustee. We acknowledge that trusts sometimes can be inferred where the will "imposes duties on [the executor] which cannot be carried into effect in a practicable manner unless the executor is a trustee." WILLIAM J. BOWE & DOUGLAS H. PARKER, 5 PAGE ON THE LAW OF WILLS § 40.9, at 127–28. Bishop Williams' will, however, grants the estate's personal representative, Yvonne L. Williams, only the powers granted by statute to a personal representative in the District of Columbia, including the power to make investments in, sell, manage, and distribute estate property. *See* D.C.Code § 20–741 (1989 Repl.). Where "the powers [imposed on an executor] are those incident to the office of executor, a trust will not be inferred." WILLIAM J. BOWE & DOUGLAS H. PARKER, 5 PAGE ON THE LAW OF WILLS, § 40.9, at 127–28. This court "cannot make a will, nor can it revise the language of the testatrix. Nor may it impute a meaning which is contrary to the expressed intention of the testatrix." *In re McCray's Estate,* 96 F.Supp. 254, 257 (D.D.C.1951). Accordingly, the trial court properly dismissed count two of the Beards' complaint.

Nor did the trial court err in dismissing count three labelled "Accounting." The court dismissed this count because it duplicated both the allegations made, and the relief sought, in count one (negligent accounting and reporting to church members). Under Super.Ct.Civ.R. 12(f), a trial court may, on its own initiative at any time, "order stricken from any pleading any ... *redundant,* impertinent, or scandalous matter." (Emphasis added.)

The Beardses also contend the trial court erred in denying as untimely their motion for class certification. *See* Super.Ct.Civ.R. 23–I(b)(1) (1996) (requiring motion for class certification to be filed within 90 days of filing complaint). Because we reverse as to count one of the complaint and affirm dismissal of counts two and three, we need not consider

the denial of the Beards's motion for class certification as untimely; that issue is now moot. *See Price v. District of Columbia Bd. of Elections & Ethics,* 645 A.2d 594, 600 n. 20 (D.C.1994); *In re Plummer,* 608 A.2d 741, 746 n. 7 (D.C.1992).

## III.

### *Appeal No. 95–CV–527*

The Beardses contend the trial court erred in dismissing under Super.Ct.Civ.R. 12(b)(6) their first-filed complaint for failure to state a claim on which relief can be granted. In reviewing a 12(b)(6) dismissal, we must construe the complaint in the light most favorable to the plaintiff and accept its allegations as true. *See Fraser v. Gottfried,* 636 A.2d 430, 430 (D.C. 1994); *Auto World, Inc. v. District of Columbia,* 627 A.2d 11, 13 (D.C.1993). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim that would entitle him [or her] to relief." *McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (D.C.1979) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

The Beardses contend, primarily, that the trial court erred in dismissing their claims for breach of contract (count one) and for tortious interference with contract (count five). The court did so because it found nothing in the complaint to indicate that Eddyemae Beards had an employment contract with Bible Way—a necessary prerequisite for breach of contract and tortious interference with contract claims. Viewing the complaint in the light most favorable to the Beardses, we conclude the trial court did not err.

According to the complaint, Eddyemae Beards was hired by Bishop Williams and, later, re-hired by Pastor Silver. The Beardses do not allege that at any time there was a formal contract of employment or any agreement between Bible Way Church and Eddyemae Beards fixing a period of time for her employment. In the District of Columbia, where there is no clear expression of an intent to enter into a contract for a fixed

period, we recognize a presumption that "the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party." *Sullivan v. Heritage Foundation*, 399 A.2d 856, 860 (D.C.1979) (quoting *Littell v. Evening Star Newspaper Co.*, 73 App.D.C. 409, 410, 120 F.2d 36, 37 (1941)); *see Simard v. Resolution Trust Corp.*, 639 A.2d 540, 551 (D.C.1994); RESTATEMENT (SECOND) OF AGENCY § 442 (1958).

 The Beardses failed to cite in the complaint any facts which, if taken as true, would rebut the presumption of at-will employment. *See Sullivan*, 399 A.2d at 860 (presumption rebuttable by circumstantial evidence that parties intended employment for fixed period). The Beardses stated in their complaint that Eddyemae Beards intended to work until she was seventy and that there was a "tacit agreement" that she would work for the church as long as she desired. Even assuming such an agreement, that would not suffice to rebut the at-will presumption. *See id.* (even speaking in terms of "permanent" employment does not rebut at-will presumption where no fixed period of employment); *Littell v. Evening Star Newspaper Co.*, 73 App.D.C. 409, 411, 120 F.2d 36, 38 (1941) (same). Accordingly, there was no basis for either a breach of contract or a tortious interference with contract claim, and thus both counts one and five were properly dismissed. *See Wemhoff v. Investors Management Corp.*, 528 A.2d 1205, 1208 n. 3 (D.C.1987) (at-will employee can be fired for any or no reason).[7]

 The Beardses further contend, however, that even if Eddyemae Beards was an at-will employee, the trial court erred in concluding that the complaint did not fit within the tort of wrongful discharge recognized in *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C.1991). In *Adams*, this court cited public policy to craft a "very narrow exception" to the at-will employment doctrine. In order to qualify under that exception, an employee must show that "the sole reason for [his or her] discharge is the employee's refusal to violate the law as expressed in a statute or municipal regulation." *Id.*

 Although the complaint did not expressly allege a wrongful discharge claim, the trial court construed the complaint liberally to include such a claim on the ground that plaintiffs had "suggest[ed] that defendants wrongfully fired Eddyemae Beards in retaliation for her alleged compliance with the Internal Revenue Code." The Beards' complaint alleges that, as the church's Financial Secretary, Eddyemae Beard issued a $15,600 salary check pursuant to "certain Federal and District of Columbia Tax Regulations," an act that led to a decline in her relationship with Pastor Silver. Besides merely asserting in a conclusory fashion that issuance of the check was required by unspecified tax laws, the complaint supplies no basis for finding that this was the reason for her dismissal nearly two years later. As currently pleaded, the complaint sets forth facts showing only that Eddyemae Beards' unauthorized issuance of the check was later subject to Pastor Silver's disapproval and reprimand. The facts as alleged, moreover, suggest that Eddyemae Beards' dismissal by the church's five-member board of trustees in December 1993 was the result of an administrative reorganization taking place in the church and was not related to her earlier issuance of the check. The complaint, therefore, failed to set forth a sufficient basis for a wrongful discharge based on *Adams*. There was no clear allegation, or proffered evidence, of discharge based on refusal to violate the law, *see Adams*, 597 A.2d at 34; nor was there any other allegation, or proffered evidence, that conceivably could state a claim on some other public policy ground this court might recognize.[8]

7. The trial court also found no basis for a promissory estoppel claim. After assuming, without any proffered evidence, that Bible Way Church had promised to employ Eddyemae Beards for as long as she desired, the trial court found nothing to indicate that she had relied on such a promise. *See Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C.1979) (promissory estoppel requires evidence of promise, promise must reasonably induce reliance upon it, and promise must be relied on to detriment of promisee).

8. *See Carl v. Children's Hospital*, 657 A.2d 286 (D.C.), *vacated and reh'g granted*, 665 A.2d 650 (D.C.1995) (per curiam), No. 93–CV–1476 argued en banc Oct. 12, 1995 (pending decision).

**434**

As for the remaining counts, two, three, four, and six, the Beardses have not argued on appeal that the trial court erred in dismissing their claims, respectively, for harassment, defamation, intentional infliction of emotional distress, and invasion of privacy. "This court is not duty bound to resolve an issue of law that the parties do not contest." *Mims v. Mims,* 635 A.2d 320, 329 (D.C.1993) (omitting citations). Because they have not been contested, we therefore deem the issues waived and affirm the dismissals. *See id.; Giordano v. Interdonato,* 586 A.2d 714, 719 n. 9 (D.C.1991).

\* \* \*

In No. 95–CV–311 we reverse the trial court's denial of Bible Way's motion to dismiss count one (negligence) count but affirm the dismissal of counts two and three. We affirm dismissal of the complaint in Appeal No. 95–CV–527.

*So ordered.*

In *Carl,* this court has under advisement the question whether the public policy exception in *Adams* should be expanded to include the discharge of an at-will employee nurse who allegedly was dismissed after testifying at a public hearing as an expert against proposed tort reform legislation supported by her hospital employer and also providing expert testimony in medical malpractice litigation. No allegations or proffered evidence in the instant complaint can be construed to state a claim that goes beyond the *Adams* exception; thus, there is no reason to hold this case pending resolution of *Carl.*